UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BRITTNEY M. AUGUSTINE,

                 Plaintiff,

        v.

COMMISSIONER OF SOCIAL SECURITY,

                 Defendant.

**DECISION AND ORDER**

6:15-CV-06145-EAW

## I.   INTRODUCTION

Plaintiff Brittney M. Augustine ("Plaintiff"), through counsel, brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying Plaintiff's application for disability insurance benefits ("DIB"). (Dkt. 1). Presently before the Court are the parties' opposing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 7; Dkt. 9). For the reasons set forth below, the Commissioner's motion is GRANTED and Plaintiff's motion is DENIED.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.   Overview

In August 2011, Plaintiff applied for social security disability benefits, alleging that she became disabled on September 29, 2009, due to a torn disc in her back, bipolar

disorder, anxiety, a right knee injury, depression, seizure disorder, and migraines. (Administrative Transcript (hereinafter "Tr.") 178, 182, 201).

The Commissioner denied Plaintiff's application on November 10, 2011. (Tr. 91-94). Plaintiff requested a hearing before an ALJ. (Tr. 97-98). On March 11, 2013, Plaintiff, represented by counsel, appeared and testified at a video hearing before ALJ Greener. (Tr. 30-56).

On May 30, 2013, the ALJ issued a decision determining that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 7-29). The Appeals Council denied review on January 12, 2015; accordingly, the ALJ's decision became the final decision of the Commissioner. (Tr. 1-6). Plaintiff commenced this action on March 16, 2015. (Dkt. 1).

### B.    The Non-Medical Evidence

#### 1.    Plaintiff's Testimony

On the date of the hearing, Plaintiff was 30 years old and lived with her 7-year-old daughter. (Tr. 35). She measured five feet, five inches tall and weighed 197 pounds. (*Id.*). She explained that she did drive but, that day, her father drove her to the hearing. (Tr. 35-36). She was left handed and had graduated from high school. (Tr. 36).

Plaintiff testified she stopped working in September 2009.    (*Id.*).    For approximately three years until that date, she was employed full-time at Glove House, where her responsibilities included teaching and restraining children ages 9 to 18, overseeing their safety, driving them to appointments, and conducting home visits. (Tr, 36-37). Plaintiff could not recall any other full-time work. (Tr. 37). According to her

disability report, she had a variety of part-time jobs from 2000 to 2006, including baker, home health aide, patient care assistant, and sales clerk. (Tr. 202).

According to Plaintiff, one reason that she was unable to work was because her "back always hurts." (Tr. 37, 48). She explained that she hurt her back at work. (Tr. 38). As a result, two rods were placed in her back during a June 2011 surgery, and her doctor performed MRIs. (*Id.*). To relieve her pain, she had had physical therapy but found it ineffective because the physical therapists did not comply with the doctor's orders. (Tr. 38-39). She previously had injections in her back and currently was taking Vicodin for pain and Valium for muscle spasms, both in varying daily amounts depending on the severity of her pain. (Tr. 39). She also used heat, ice, massage, and a pool to relieve her back pain. (Tr. 40). She explained that the following daily activities aggravated her back pain: doing dishes and laundry, shoveling, using the stairs, walking, entering or exiting the shower, and putting on clothes and shoes. (Tr. 39-40). Because sitting and standing for prolonged periods were also difficult for Plaintiff, she used a cane most of the time; however, she did not have it with her at the hearing. (Tr. 40).

According to Plaintiff, another reason that she was unable to work was because of her mental health: she had "horrible anxiety and depression, and [was] bipolar." (Tr. 37, 48). Dr. Alam was her psychiatrist. (Tr. 40). She also saw Katie, a Family Services counselor, every two weeks. (Tr. 40-41). Her psychiatrist prescribed her the following medications to treat her mental health conditions: Lexapro, Topamax, Lamictal, Xanax, and Trileptal. (Tr. 41). Despite taking those medications, Plaintiff maintained that her

anxiety and depression, which began when she injured her back in 2008, were "still really bad." (Tr. 41, 42).

Plaintiff often does not like to leave the house because she then feels sick to her stomach and as though her throat closes up; in particular, large or crowded stores like Wal-Mart are overwhelming to her. (Tr. 42, 47). In a typical day, she remains in bed, watches television, looks for jobs on the computer and, in the afternoon, picks up her daughter from Plaintiff's father's house, where her daughter sometimes sleeps. (Tr. 42, 51). Plaintiff's father helps her prepare dinner and assists with her daughter's homework and schooling because Plaintiff finds those tasks overwhelming. (Tr. 42-43). As for household chores, Plaintiff can vacuum for approximately ten minutes, but a friend comes over three to four times each week to clean dishes, wash and fold laundry, and sweep the steps. (Tr. 43, 46). Plaintiff's friend also helps her get into and out of the shower and then put on her clothes. (Tr. 43). She rarely shops for groceries and occasionally cooks simple meals, finding it difficult to stand for prolonged periods. (Tr. 44, 47-48). She saw her father daily and sometimes visits nearby friends. (Tr. 44). Every year, she and her family typically travel to Florida, where she took her daughter to Disney World. (Tr. 45).

Plaintiff testified about other physical issues. She had problems with her right knee, for which she receives shots and is supposed to wear a knee brace, although she does not do so unless, for example, she goes to "big parks like Disney World." (Tr. 48). She could not lift more than ten pounds. (Tr. 49). She experiences numbness in her hands. (*Id.*). She had epilepsy, which caused her to fall and have seizures. (Tr. 50). To

treat the epilepsy, she takes Lamictal. (Tr. 51). She had trouble remembering things. (Tr. 53). And, she had headaches once or twice each week, which she attributed to her high blood pressure. (Tr. 54).

## C.    Summary of the Medical Evidence

### 1.    Mental Health Conditions

On August 10, 2010, Plaintiff saw a psychiatrist, Dr. John Deines, for an assessment. (Tr. 536-37). Plaintiff stated that she wished to transfer her care from a previous psychiatrist, Dr. Sarakanti, to Dr. Deines because she did not agree with Dr. Sarankanti's treatment plan and proposed changes to her psychiatric medications. (Tr. 536). She stated that her current psychiatric medication regime was working adequately for her without side effects, so she wanted it to remain the same. (*Id.*). Plaintiff denied suicidal or homicidal ideation. (*Id.*). Dr. Deines noted her diagnosis of bipolar disorder and continued her prescriptions for Xanax, Topamax, Lexapro, and Lamictal. (Tr. 537).

On October 19, 2010, Dr. Deines saw Plaintiff to adjust her dosage of Topamax, which she used for her headaches, seizure disorder, and bipolar disorder. (Tr. 546). Plaintiff otherwise reported that she "continue[d] to feel her psychiatric medications work[ed] adequately for her without side effects." (*Id.*). She also reported that she had "trouble with occasional irritability, but continues to feel her mood is okay overall" and "continues to be without suicidal ideation." (*Id.*).

On December 14, 2010, Plaintiff saw Dr. Deines. (Tr. 551). Plaintiff reported that she had been "having more trouble with depression and anxiety again lately" and was "spending more time in bed . . . ." (*Id.*). She also reported taking Xanax more frequently

and "continued to be significantly symptomatic"; she questioned whether she needed an adjustment to her medications, even though she felt her psychiatric medications had been working adequately for her. (*Id.*).

On February 8, 2011, Plaintiff saw Dr. Deines and reported that she had been taking her medications inconsistently before running out of refills; since then, she felt overwhelmed, anxious, and depressed. (Tr. 558). She reported feeling stressed, depressed, anxious, and overwhelmed because of a breakup and issues with her boyfriend. (*Id.*). She also reported a desire to find a job because she needed "to find something to do with [her] time." (*Id.*). Previously, Plaintiff reported that the medications worked adequately, and so Dr. Deines restarted Plaintiff on the same medications. (*Id.*).

On February 22, 2011, Plaintiff saw Dr. Deines for a follow-up examination after restarting her medications. (Tr. 561). She reported that her depression and anxiety had diminished but remained significant, as she continued to isolate herself in bed and sleep frequently. (*Id.*). Dr. Deines instructed her to continue her medications. (*Id.*).

On March 14, 2011, Plaintiff saw Dr. Deines and reported that her "depression and anxiety [we]re less since being back on her medications, but continue. She [wa]s still isolating [a lot] in bed, but primarily attributes this to pain." (Tr. 565). She denied suicidal ideation. (*Id.*). Dr. Deines restarted Plaintiff on her medications again. (*Id.*).

On March 28, 2011, Plaintiff saw Dr. Deines for a brief appointment following blood work. (Tr. 568). Plaintiff felt that "her depression and anxiety [we]re under adequate control at th[a]t time," and that her medications were working adequately for

her. (*Id.*). She stated that she was going with her daughter and parents to Florida and Disney World the following week. (*Id.*).

On April 26, 2011, Plaintiff saw Dr. Deines in regard to her medications; reporting that she still felt that her depression and anxiety were adequately controlled. (Tr. 571). She reported that she frequently missed doses of Lamictal because it made her nauseous, but she still felt that her psychiatric medications worked adequately for her. (*Id.*). Dr. Deines decided to discontinue Lamictal "to clarify if it is really providing . . . any benefit," but he continued her Topamax and Lexapro. (*Id.*).

On May 24, 2011, Plaintiff had another appointment with Dr. Deines. (Tr. 574). She told him that she was about to have back surgery, and that her primary care physician had recently diagnosed her with fibromyalgia. (*Id.*). Again, she reported that her depression and anxiety were controlled adequately and that her psychiatric medication—at that time, only Lexapro—was working adequately for her without side effects. (*Id.*). She denied any problems related to going off Lamictal. (*Id.*).

On June 28, 2011, Plaintiff saw Dr. Deines for a follow-up examination and reported that she felt more irritable and significantly more anxious and depressed after her back surgery. (Tr. 578). She also reported feeling more depressed and anxious, with frequent crying spells. (*Id.*). As a result, Plaintiff decided, on her own accord, to start taking Lamictal again. (*Id.*). Dr. Deines continued Lamictal and recommended that Plaintiff continue with her other medications. (*Id.*).

Plaintiff had appointments with Dr. Deines for medication management on September 14, 2011, October 12, 2011, January 3, 2012, and April 3, 2012. (Tr. 711,

714, 725, 738).   At the October 12, 2011, appointment, Plaintiff reported "[a] lot of stress lately" stemming from her daughter's placement in a different school district and from Plaintiff's applications for SSI and SSD.   (Tr. 714).   Over the holidays, she reported increased anxiety, but it diminished after the holidays.   (Tr. 725).   Dr. Deines recommended that Plaintiff continue on Lexapro and Xanax as needed.   (Tr. 711, 714, 738).

On October 26, 2011, psychologist Sara Long, Ph.D. of Industrial Medical Associates P.C., conducted a consultative psychiatric examination of Plaintiff. (Tr. 655). Dr. Long had no doctor-patient relationship with Plaintiff.   (Tr. 659).   Plaintiff drove herself a distance of one mile to the evaluation.   (Tr. 655).   Plaintiff described her psychiatric treatment, informing Dr. Long that she had been hospitalized for psychiatric reasons during high school and thereafter attended outpatient treatment. (*Id.*).   Plaintiff reported that she received treatment for depression and anxiety, not being able to work, and physical limitations. (*Id.*).   Dr. Long performed a mental status examination, which showed that Plaintiff was "cooperative with good social skills."   (Tr. 656).   The mental status examination showed that Plaintiff was neat and well groomed, used a cane, and wore eyeglasses and a back brace; she also had clear and fluent speech with adequate receptive and expressive language, coherent and goal-directed thought processes, and appropriate affect and thought content. (Tr. 657).   The examination also showed that Plaintiff's mood was euthymic, she was well oriented, and she was functioning on an average intellectual level. (*Id.*).   Dr. Long completed a medical source statement, opining that Plaintiff:

> was able to follow and understand simple directions and instruction and to perform simple tasks independently. She was able to maintain attention and concentration and is able to maintain a regular schedule. She is able to learn new tasks, perform complex tasks, make appropriate decisions, relate adequately with others, and is capable of adequate stress management.

(*Id.*). Dr. Long concluded, "Results of the present evaluation appear to be consistent with psychiatric problems, but in itself, this does not appear to be significant enough to interfere with her ability to function on a regular basis." (Tr. 658). As to diagnoses, Dr. Long stated that "[i]mpulse control disorder . . . [and a]djustment disorder with depression and anxiety" were not ruled out." (*Id.*). Dr. Long recommended reevaluating Plaintiff's psychotherapy, anxiety medication, and stress management, but concluded that the "[p]rognosis [wa]s good given appropriate psychotherapy and motivation to acquire skills . . . ." (*Id.*).

In November 2011, Dr. Lisa Blackwell, a psychological consultant, reported in a Disability Determination explanation that Plaintiff had diagnoses of a spine disorder, epilepsy, migraines, and an affective disorder. (Tr. 83084). She noted that the affective disorder resulted in: (1) mild restriction of activities of daily living; (2) mild difficulties in maintaining social functioning; (3) mild difficulties in concentration, persistence, and pace; and (4) no repeated episodes of decompensation. (Tr. 84). Dr. Blackwell noted that the October 26, 2011 medical opinion (presumably of Dr. Long) was the only psychiatric opinion in the file, and she gave it great weight. (Tr. 85). Dr. Blackwell concluded that Plaintiff was not disabled. (Tr. 88).

On March 19, 2012, Dr. Robert Rymer, a medical consultant, completed a medical evaluation and concluded that Plaintiff's mental impairments were stable on medication.

(Tr. 672).  He also found that, based on the altering severities of physical and mental conditions, a fully favorable determination as to the alleged onset date was not supported by the evidence; however, a closed period of disability for Plaintiff's psychiatric impairments should be considered.  (Tr. 673).

On March 27, 2012, medical consultant Dr. Paula Kresser, Ph.D., reviewed the medical evidence and completed a rating of Plaintiff's functional limitations.  (Tr. 682). Dr. Kresser checked off boxes to indicate that Plaintiff had: (1) a mild restriction of activities of daily living; (2) mild difficulties in social functioning; (3) mild difficulties in maintaining concentration, persistence, or pace; and (4) no repeated episodes of decompensation.  (*Id.*).  Dr. Kresser summarized Plaintiff's medical evidence from September 2009 through October 2011 (Dr. Long's examination).  (Tr. 684).  Dr. Kresser concluded that the evidence showed that Plaintiff responded positively to regular compliance with her medication in April 2010.  (*Id.*).  Dr. Kresser stated that the "[c]urrent Consultative Exam d[id] not indicate any significant limitations" which were "non-severe for program purposes."  (*Id.*).

On May 1, 2012, Plaintiff saw Dr. Deines and reported that she had enjoyed a recent trip with her daughter to Florida, where Plaintiff felt some anxiety but felt that she dealt with it adequately.  (Tr. 742).  However, Plaintiff complained of anxiety attacks. (*Id.*).  Accordingly, Dr. Deines adjusted Plaintiff's medications and switched her from Lexapro to Buspar.  (*Id.*).

On June 12, 2012, Plaintiff saw Dr. Deines and "was very irritable during the session."  (Tr. 752).  She told Dr. Deines that she self-discontinued Buspar due to side

effects of nausea and dizziness. (*Id.*). When Dr. Deines questioned Plaintiff's diagnosis of Bipolar I Disorder and asked about her diagnosis of post-traumatic stress disorder, Plaintiff became upset and later transferred her case to another psychiatrist. (*Id.*) Dr. Deines noted that Plaintiff had recently applied for disability benefits. Dr. Deines recommended that Plaintiff lower her Buspar dosage and continue on Lexapro and Xanax as needed. (*Id.*).

On July 10, 2012, Plaintiff saw Dr. Muhammad Alam, her new psychiatrist following her transfer from Dr. Deines. (Tr. 757). She complained of manic episodes, panic attacks, depression, and anxiety, stating that the episodes last for at least one week, and "then she crashes into depression." (*Id.*). Dr. Alam conducted a mental status examination, which showed that Plaintiff was depressed and anxious, there was psychomotor agitation, her mood was depressed, and her affect was labile. (*Id.*). Plaintiff denied suicidal and homicidal ideations. (*Id.*). Dr. Alam observed that her attention, concentration, judgment, insight, and impulse control were fair. (*Id.*). He diagnosed her with bipolar disorder and "rule-out borderline personality disorder". (Tr. 757-58). He gave her a Global Assessment of Functioning ("GAF") score of 45.[1] (Tr. 758). He discontinued Buspar and prescribed Lexapro, Xanax, and Saphris. (*Id.*).

---

[1] "GAF is a scale that indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning. The GAF scale ranges from 0 to 100; GAF scores from 61–70 indicate some mild symptoms or some difficulty in social, occupational, or school situations, but general functioning and the existence of some meaningful personal relationships. GAF scores between 51–60 indicate that the individual has moderate symptoms or moderate difficulty in social, occupational, or school situations." *Petrie v. Astrue*, 412 F. App'x 401, 406 n.2 (2d Cir. 2011) (citations omitted).

On July 24, 2012, Plaintiff told Dr. Alam that she decided to discontinue Saphris because it made her feel drowsy. (Tr. 765). She told Dr. Alam that she was stressed and depressed because her father had been hospitalized and her friend died. (*Id.*). She also told Dr. Alam that she was going on vacation the next week. (*Id.*). Dr. Alam's mental status examination showed that Plaintiff appeared "calm and cooperative," but her mood was depressed and her affect was constricted. (*Id.*). The examination also showed that Plaintiff denied social and homicidal ideation, was alert and oriented, and had fair attention, concentration, judgment, insight, and impulse control. (*Id.*).

On August 10, 2012, Plaintiff had an appointment with Dr. Alam for medication management. (Tr. 769). According to his notes, Plaintiff "report[ed] that she is doing fine on the medication and denie[d] any side effects from the medication. [Plaintiff] stated that Lexapro is helping her with her mood and Trileptal did help her a little but she still has racing thoughts and irritability at times." (*Id.*). Dr. Alam's mental status examination showed that Plaintiff was "calm and cooperative," but her mood was depressed and her affect was irritable. (*Id.*). The examination also revealed that Plaintiff denied social and homicidal ideation, was alert and oriented, and had fair attention, concentration, judgment, insight, and impulse control. (*Id.*). Dr. Alam recommended continuing Plaintiff's medications. (*Id.*).

On September 7, 2012, Plaintiff had another appointment with Dr. Alam. (Tr. 772). She told him that she was "doing much better on medication and denie[d] any side effects from medication," and her "mood [wa]s much better now." (*Id.*). Dr. Alam observed that Plaintiff was "calm and cooperative," her mood was "okay" and affect

"stable and full range"; additionally, her attention, concentration, judgment, and insight were fair, and her impulse control was good. (*Id.*).

On November 7, 2012, Dr. Alam completed a Mental Residual Functional Capacity Questionnaire. (Tr. 705-09). He noted that Plaintiff's current GAF was 45, and he listed her diagnoses of bipolar disorder, rule-out borderline personality disorder, back pain, asthma, and epilepsy. (Tr. 705). Dr. Alam described his clinical findings as follows: Plaintiff suffered from bipolar disorder and may engage in verbal and physical altercations because of her emotional instability, including anger, irritability, and difficulty taking instructions and criticism from supervisors. (*Id.*). She also had difficulty with her focus, attention, and concentration such that completing a job without "someone by her side [to] help her on each and every step" would be hard for her. (*Id.*).

In the Questionnaire, Dr. Alam rated Plaintiff's mental abilities and aptitudes needed to perform unskilled work. (Tr. 707). He determined that she had no limitation in her ability to: (1) remember work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out those instructions; (4) make simple work-related decisions; (5) ask simple questions or request assistance; and (6) be aware of normal hazards and take normal precautions. (*Id.*). She had limited but satisfactory abilities to: (1) maintain attention for two hours; (2) maintain regular attendance and be punctual; (3) sustain an ordinary routine without special supervision; and (4) perform at a constant pace without an unreasonable number and length of rest periods. (*Id.*). She was seriously limited, but not precluded in her abilities to: (1) work in coordination with or near to others without undue distraction; (2) accept instruction and criticism from

- 13 -

supervisors; (3) get along with co-workers without distraction or demonstrating behavioral extremes; (4) respond appropriately to changes in a routine work setting; and (5) deal with normal work stress. (*Id.*). Dr. Alam found that, due to her high levels of anxiety, Plaintiff could not satisfactorily complete a normal workday and workweek without interruption from psychologically-based symptoms. (*Id.*). Dr. Alam estimated that Plaintiff would be absent from work more than four days each month. (Tr. 709).

On November 30, 2012, Plaintiff saw Dr. Alam and reported that she had anxiety about appearing before the ALJ in connection with her administrative hearing. (Tr. 802). On mental status examination, Dr. Alam observed that Plaintiff was calm and cooperative, had no psychomotor agitation, and had a good mood and stable affect. (*Id.*) The examination also showed that Plaintiff was alert, oriented, and had fair attention, concentration, judgment, insight, and impulse control. (*Id.*). Dr. Alam continued her medications. (*Id.*).

### 2.   Musculoskeletal Condition

On December 19, 2007, Plaintiff slipped on ice at work. (Tr. 270, 272). Later that day, she went to the emergency room at Arnot Ogden Medical Center because of pain in her upper and lower back and left elbow. (*Id.*). X-rays of her elbow were negative for fracture and dislocation, but an x-ray of her lumbar spine showed "[m]ild scoliosis thoracolumbar spine without acute bony abnormality." (Tr. 276). A doctor prescribed Plaintiff Toradol and discharged her that same day. (Tr. 271).

In January and February 2008, Plaintiff saw Jodi Cardinale, a physician's assistant at Internal Medicine Associates of the Southern Tier, P.C., regarding Plaintiff's back

pain, which she described as radiating from her lower back up to her ribcage. (Tr. 289).
Cardinale noted that Plaintiff had "some tenderness with palpitation over her paraspinal
muscles bilaterally" and a "full range of motion." (*Id.*). Plaintiff planned to see a
chiropractor but did not want to have physical therapy. (Tr. 290). Plaintiff noted that her
depression was well controlled with medication. (*Id.*). Cardinale prescribed Skelaxin.
(Tr. 289).

On July 14, 2009, Dr. W. David Ferraraccio, an orthopedist, saw Plaintiff for an
independent medical examination in connection with her workers' compensation claim.
(Tr. 278-81). Plaintiff complained of back and right lower extremity pain following her
slip-and-fall. (Tr. 278). Dr. Ferraraccio noted that Plaintiff had an electromyography
(EMG) study, which was "negative for lumbar radiculopathy." (*Id.*). Plaintiff also had a
lumbar magnetic resonance image (MRI), which showed "some degenerative changes at
the L4-5 disc producing some degree of stenosis, left greater than right, as well as
degenerative change at L5-S1 with a tiny subligamentous protrusion, which did abut the
L5 nerve root and showed more significantly compression of the L4" disc. (Tr. 278; *see
also* Tr. 370-72, 418-19). Plaintiff reported that physical therapy was not effective and
that chiropractic treatment was somewhat effective. (Tr. 278). She stated that her current
medications were Vicodin and Skelaxin, but she did not take the medications regularly
because she could not work while taking them. (*Id.*). She complained of constant pain in
her lower back, which was aggravated by increased activity like, for example, when she
played softball. (*Id.*). She also complained of radicular pain on the right side from her
thigh to her toe, and of her feet falling asleep. (*Id.*).

On physical examination, Dr. Ferraraccio observed that Plaintiff was "ambulatory with no assistive device" and was able to get "off and on the exam table without assistance." (Tr. 280). Plaintiff had "a mild degree of paraspinal spasm but no sciatic notch tenderness," and she reported increased discomfort at 40 to 45 degrees of flexion and 20 to 25 degrees of extension. (*Id.*). Plaintiff had full muscle strength in the lumbar spine, a positive straight leg raise test on the right side, and no residual complaints about her elbow. (Tr. 281). Dr. Ferraraccio opined that Plaintiff had degenerative disc disease at the L4-5 and L5-S1 disc levels with possible low grade right lumbar radiculopathy. (*Id.*).

From August through September 2009, Plaintiff received physical therapy for low back pain with right leg radicular pain. (Tr. 282-83). The physical therapist found that Plaintiff had no limitation in lumbar spine range of motion. (Tr. 282). The physical therapist discharged Plaintiff because she had a significant improvement in lumbar range of motion and symptoms. (*Id.*).

On September 29, 2009, Plaintiff saw nurse practitioner Kathleen Machuga in connection with Plaintiff's workers' compensation claim arising out of her December 2007 slip-and-fall injury. (Tr. 284). Machuga observed that Plaintiff's gait was intact. (*Id.*). Plaintiff reported that her back pain was constant, interfered with her daily activities, and was exacerbated by walking, sitting for long periods, and lifting. (Tr. 285). She reported that she was still working without restrictions but sometimes found it difficult because of her pain. (*Id.*). She also reported that heat and pressure relieve the pain, for which she took no medications. (*Id.*). Maschuga's physical examination of

Plaintiff showed that Plaintiff had "bilateral paraspinal muscle tenderness" in the lumbar spine and "decreased range of motion in all directions." (Tr. 286). Plaintiff's straight leg raise test was negative bilaterally. (*Id.*). Maschuga's diagnosis was chronic pain syndrome and low back pain; she advised Plaintiff to continue Topamax and Lamictal. (Tr. 286). Maschuga opined that Plaintiff had activity restrictions: she should limit her days to eight-hour shifts and should no longer restrain combative clients at her then-job as a residential counselor. (Tr. 287). Maschuga opined that Plaintiff had a mild (25%) disability for workers' compensation purposes, noting that Plaintiff would benefit from vocational rehabilitation. (*Id.*).

On October 27, 2009, Plaintiff saw Dr. Kenneth Subin for a follow-up examination of her lower back in connection with her workers' compensation claim. (Tr. 379-80). Dr. Subin reported that Plaintiff had "right paraspinal muscle tenderness" and "decreased range of motion in all directions" in the lumbar spine. (Tr. 380). Plaintiff had an intact gait, partial ability to squat, normal reflexes, normal muscle strength throughout, and normal sensation to touch. (*Id.*). Dr. Subin noted that Plaintiff could return to work immediately with certain activity restrictions, and concluded that she had a mild-to-moderate disability of 33%. (Tr. 381).

On November 5, 2009, Plaintiff saw Dr. Vidyasagar Mokureddy, a pain management specialist, regarding her lower back. (Tr. 416). For approximately a year, Plaintiff reported no change in her condition, and Dr. Mokureddy gave her an injection nearly every month. (Tr. 404-16).

On November 12, 2009, Plaintiff saw Dr. Khalid Sethi, a neurologist, for an initial neurosurgical evaluation.   (Tr. 300).   She complained of "severe mechanical back discomfort with pain across her back predominantly in the lower back," and explained that the pain sometimes radiated down into her thigh. (*Id.*).   She listed her medications: Topamax, Lamictal, Lexapro, Vicodin, and Xanax. (*Id.*).   Plaintiff was neurologically intact and had near-to-full strength in the upper and lower extremities. (Tr. 301).   Dr. Sethi stated that Plaintiff's gait was antalgic, and her straight leg raise test was negative bilaterally. (*Id.*).   The doctor stated that Plaintiff's lumbar MRI, showing "predominantly degenerative disc disease at L5-S1 with some loss of disc height," was not as concerning as the radiologist suggested. (*Id.*).   Dr. Sethi opined that, on clinical grounds, there was "no evidence of myelopathy, radiculopathy, cauda equine or conus symptomatology," or other nerve problems. (*Id.*).   Dr. Sethi recommended conservative pain management, rather than surgery. (Tr. 302).

On December 8, 2009, Plaintiff saw Dr. Kenneth Subin for another worker's compensation-related examination regarding her lower back.   (Tr. 387).   Plaintiff reported that her low back pain improved after she received steroid injections from Dr. Mokureddy and that she had full range of motion of the lumbar spine. (Tr. 387-88).   Dr. Subin wrote that Plaintiff could return to work immediately with certain activity restrictions. (*Id.*).

On January 19, 2010, Plaintiff saw Dr. Susan Parmenter for an examination in connection with Plaintiff's workers' compensation. (Tr. 391).   Plaintiff complained that she fell recently, and since then, had increased pain in her lower back, bilateral leg

weakness, and left shoulder pain since her fall. (Tr. 391-92). Dr. Parmenter reported that

Plaintiff had full range of motion of the lumbar spine, an intact gait, full strength in the

lower extremities, and normal sensation. (Tr. 392). Dr. Parmenter opined that Plaintiff

had a partial temporary disability and a mild-to-moderate disability status (33%) for

workers' compensation purposes. (Tr. 393). Dr. Parmenter stated that Plaintiff "may

return to work immediately" with the following activity restrictions: "bending, kneeling,

lifting, pushing, pulling, sitting, stooping, standing, walking, working at heights, [and]

working on scaffolding." (*Id.*). Dr. Parmenter examined Plaintiff again on April 19,

2010, and reached the same conclusion. (Tr. 396-97).

In March 2010, Plaintiff saw Dr. Brand regarding pain in her right foot and ankle

after a fall that occurred a week earlier. (Tr. 590). On March 4, 2010, Dr. Brand

observed mild tissue swelling in Plaintiff's right ankle. (Tr. 591). Dr. Brand explained

that Plaintiff had a "nondisplaced fracture of her ankle" and applied a short leg cast.

(*Id.*). On March 23, 2010, Plaintiff returned to see Dr. Brand, complaining of pain in her

right ankle and knee. (Tr. 592). Based on an x-ray, Dr. Brand concluded that Plaintiff's

right ankle fracture was nondisplaced. (Tr. 593). He observed that Plaintiff could bear

weight with minimal discomfort. (*Id.*). Dr. Brand removed the short leg cast and

prescribed a lace-up ankle brace. (*Id.*). One week later, Plaintiff saw Dr. Brand with

continued complaints of right ankle pain, and so Dr. Brand prescribed a well-padded

short leg cast. (Tr. 595). The following week, Plaintiff told Dr. Brand that her right

ankle had improved, so Dr. Brand removed her cast. (Tr. 596-97). On April 29, 2010,

Plaintiff saw Dr. Brand, complaining of extreme right ankle pain. (Tr. 598). Dr. Brand

prescribed a lace up brace as needed and recommended physical therapy for ankle rehabilitation. (Tr. 599).

On March 25, 2010, Plaintiff had an MRI of her lumbar spine. (Tr. 373). Based on the MRI, Dr. Kenneth Pearsen found as follows: "1. No lumbar compression fracture or spondylolisthesis. 2. L5-S1 stable degenerative disc protrusion (contained herniation) with ventral thecal sac deformity, stable when compared to prior study. 3. No additional lumbar disc herniation or spinal stenosis evident." (*Id.*).

On June 14, 2010, Plaintiff reported to Dr. Subin chronic lower back pain; her physical examination showed decreased range of motion in all directions in the lumbar spine. (Tr. 399). Dr. Subin opined that Plaintiff had a partial temporary disability and a mild-to-moderate disability status (33%) for workers' compensation purposes. (Tr. 400). Dr. Subin reported that Plaintiff "may return to work immediately," although she had activity restrictions, including limiting days to eight-hour shifts and refraining from restraining combative clients. (*Id.*). Dr. Subin also indicated that Plaintiff had restrictions in her abilities to stand, sit, walk, bend, stoop, push/pull, lift, and carry. (*Id.*).

At a June 1, 2010, follow-up appointment with Dr. Brand, Plaintiff reported that she was "making progress in physical therapy" with her right ankle pain. (Tr. 600). Dr. Brand noted that Plaintiff's "[r]ight ankle range of motion was better but slightly less [on the right side] than the left . . . [with] no palpable tenderness." (Tr. 601). In August 2010, Plaintiff reported to Dr. Brand that her right ankle had improved. (Tr. 602-03).

On September 10, 2010, Dr. Mokureddy treated Plaintiff's back pain with a right L2, L3, L4, and L5 Medial Branch Block. (Tr. 408). Dr. Mokureddy noted a diagnosis

of lumbar facet arthropathy. (*Id.*). On October 1, 2010, Dr. Mokureddy gave Plaintiff a lumbar transforaminal steroid injection utilizing fluoroscopy at the L1 level on the right side. (Tr. 407). Plaintiff tolerated the procedure well. (*Id.*).

On November 16, 2010, Plaintiff had another procedure with Dr. Mokureddy: a lumbar discography. (Tr. 403). That day, a computed tomography (CT) scan of Plaintiff's lumbar spine showed the following: the "L4-L5 disc show[ed] no abnormality," while the "L5-S1 disc show[ed] a complete tear at the 6:00 position with localized epidural leakage." (Tr. 438).

The record also contained treatment records from Dr. Seith Zeidman; the records were addressed to the Workers' Compensation Board. (Tr. 607-32). In January 2011, Plaintiff had a consultation with nurse practitioner Nathaniel Brochu and Dr. Zeidman. (Tr. 607-09). Plaintiff complained of back pain and occasional lower extremity pain. (Tr. 608). A recent MRI of Plaintiff's lumbar spine showed "[m]odest findings with a widely patent central canal" and "[h]igh-intensity zone associated with degenerative disc disease and small high-intensity zone with very small focal protrusion slightly eccentric to the left at L5-S1." (Tr. 611-12). Dr. Zeidman opined that Plaintiff "remain[ed] temporarily totally disabled" and had a 100% temporary impairment for workers' compensation purposes. (Tr. 608, 612).

On June 1, 2011, Dr. Zeidman performed back surgery on Plaintiff. (Tr. 441). Her pre-operative diagnosis was lumbar disc degeneration and lumbar stenosis. (*Id.*). During surgery, Dr. Zeidman found a "[s]everely loose joint at L5-S1 with significant disc herniation at L5-S1, right," "foraminal encroachment bilaterally," and "[b]ilateral

and severe foraminal stenosis at L4-S1." (Tr. 443). During postoperative recovery, Plaintiff "ambulated with physical therapy and she was doing quite well." (Tr. 446). Two days after surgery, Dr. Zeidman discharged Plaintiff from the hospital. (*Id.*).

On June 14, 2011, Plaintiff saw Dr. Zeidman for a follow-up examination; she reported pain in the lower back along the surgical site and weakness in her right leg. (Tr. 622). A neurological examination showed that Plaintiff had full strength in the lumbar spine and lower extremities, intact reflexes, and slightly decreased sensation at L5 and S1. (Tr. 623). Dr. Zeidman observed that Plaintiff was "doing very well" after surgery, advised her to continue wearing her brace, and stated that Plaintiff had a 100% temporary impairment for workers' compensation purposes. (*Id.*).

In July 2011, Plaintiff saw Dr. Zeidman again and reported pain in her left lower back with radiation to the left hip. (Tr. 625). Dr. Zeidman prescribed her Norco and physical therapy and advised Plaintiff to wean off wearing her back brace. (Tr. 627). In September 2011, Plaintiff was evaluated again and reported that she was feeling a lot better and was able to stand up in the shower. (Tr. 630). Plaintiff had near-to-full strength in the lower extremities, intact reflexes, and slightly decreased sensation at L5 and S1. (*Id.*). Plaintiff attended physical therapy from August 2011 through September 2011 and reported an improvement in her back condition. (Tr. 633-46).

On August 15, 2011, Plaintiff saw Dr. Francisco Corbalan, an internist, for complaints of back and lower extremity pain. (Tr. 502). Plaintiff reported that she recently had back surgery and noted that her pain had improved. (*Id.*). Dr. Corbalan noted that Plaintiff was neurologically intact, had a normal gait, and good range of

motion throughout. (Tr. 503). Dr. Corbalan recommended that Plaintiff continue taking Lyrica. (*Id.*).

On September 6, 2011, Plaintiff saw Dr. Brand. (Tr. 604). She complained of knee pain and back pain that had worsened since her back surgery in June. (*Id.*) Dr. Brand diagnosed her with bilateral knee pain, "mostly likely patellofemoral versus internal derangement," and recommended physical therapy. (Tr. 605).

On December 14, 2011, Plaintiff saw Dr. Zeidman, reporting pain across her lower lumbar spine with radiation into legs, primarily her right leg. (Tr. 694). She reported that, "[o]verall since undergoing surgery, she does feel as though she is better" and could "do more things that she was not able to do since prior to surgery." (*Id.*). Nevertheless, her pain continued and she experienced difficult dressing herself. (*Id.*). On examination, Plaintiff became "tearful when demonstrating lower extremity strength and . . . state[d] that this elicit[ed] pain." (Tr. 695). Dr. Zeidman indicated that Plaintiff had a 100% temporary disability for workers' compensation purposes. (Tr. 696).

On March 13, 2012, Dr. Zeidman re-evaluated Plaintiff, who used a straight cane and reported continuing muscle spasms across her lumbar spine. (Tr. 697). Plaintiff stated that "any increased activity" exacerbated her pain. (*Id.*). Dr. Zeidman noted that Plaintiff could not return to her job as a residential counselor, but he encouraged Plaintiff to "look into job retraining options such as the VESID." (Tr. 698). He again indicated that Plaintiff had a 100% temporary disability. (Tr. 699).

On June 1, 2012, Dr. Zeidman evaluated Plaintiff in regard to her Workers' Compensation claim. (Tr. 700). At that time, one year had passed since Plaintiff's

surgery, yet she still complained of pain in her back with radiation into her buttocks and legs. (*Id.*). She used a cane and a bone growth stimulator. (*Id.*). Dr. Zeidman again indicated that Plaintiff had a 100% temporary disability. (Tr. 701).

On September 21, 2012, Plaintiff saw Dr. Zeidman. (Tr. 702). She reported that she still felt pain in her back. (Tr. 702). Plaintiff still felt weakness in her legs and stated she was unable to walk for any long distance. (Tr. 702). Plaintiff still used a straight cane and a bone growth stimulator. (Tr. 702). Dr. Zeidman noted that her gait was antalgic and with the assistance of a cane. (Tr. 703).

On December 26, 2012, Dr. Zeidman re-evaluated Plaintiff and completed a report, addressed to the Workers' Compensation Board. (Tr. 797). In the subjective portion of the report, Plaintiff stated that she still had pain across her lumbar spine and down her legs, along with muscle spasms. (*Id.*). She also stated that she could not sit for more than 30 or 45 minutes and often had to adjust her positioning in response to her pain. (*Id.*). Dr. Zeidman's objective examination of Plaintiff showed that Plaintiff "appear[ed] healthy and well developed," with "[n]o signs of apparent distress present." (Tr. 797). As to her strength, Plaintiff had "about a 5-/5 throughout bilateral EHL and anterior tibialis. She has about a 4/5 with quadriceps, hip flexion, gastrocs on the right, 5-/5 on the left, 4+/5 on the right with extension and quadriceps strength, 5/-5 on the left." (Tr. 797-98). In the report, Dr. Zeidman documented Plaintiff's Workers' Compensation Questionnaire, which he completed with her input. (Tr. 798). The Questionnaire consisted of 25 prompts, such as "CHRONIC PAIN" and "TROUBLE WITH STAIRS/TERRAIN," the majority of which were answered by the words yes, no,

or N/A. (*Id.*). According to the Questionnaire, Plaintiff had chronic pain, continuously used painkillers, had gait deviation, had trouble with stairs and with sitting or standing for more than two hours, had undergone failed surgery and pain management, and needed help with daily living and getting dressed. (*Id.*). Based on the Questionnaire, Dr. Zeidman concluded that Plaintiff had a 75% temporary disability for workers' compensation purposes. (Tr. 798-99).

### 3. Headaches and Seizures

In January 2009, Plaintiff saw Dr. James Cummins, a neurologist, to evaluate her headaches. (Tr. 433). She reported her history of bipolar disorder and seizures and listed her current medications as Depakote, Ultram, and Vicodin. (*Id.*). On mental status examination, Dr. Cummins reported that Plaintiff was alert and oriented, had clear speech, and was neurologically intact. (*Id.*). Dr. Cummins recommended that Plaintiff obtain a brain MRI and electroencephalogram (EEG). (*Id.*).

On February 12, 2009, Plaintiff saw neurologist Dr. Leonid Segal for an EEG and MRI in connection with her headaches. (Tr. 430). Dr. Segal stated that Plaintiff's brain MRI was normal and an EEG "was suggestive of absence epilepsy." (Tr. 431). Dr. Segal prescribed Topamax and instructed Plaintiff to avoid driving for at least six to eight months. (*Id.*).

On March 20, 2009, Plaintiff saw Dr. Segal for a follow-up visit after her EEG was abnormal. (Tr. 428). Plaintiff stated that she had seizures in childhood but denied any recent seizures. (*Id.*). She related that she was taking Topamax and Lamictal with no side effects. Dr. Segal diagnosed "absence epilepsy," "tension/migrainous headaches,"

and bipolar disorder. (*Id.*). He recommended that Plaintiff continue Topamax 50 mg a day and increased Plaintiff's Lamictal dosage. (*Id.*).

On May 21, 2009, Plaintiff saw Dr. Segal for a follow-up visit and reported that she had discontinued Topamax and Lamictal. (Tr. 426). On June 11, 2009, Plaintiff saw Dr. Segal again and reported that she had restarted Topamax and Lamictal, without any side effects from those medications. (Tr. 424). Her seizures and headaches were both "quiet." (*Id.*). She reported that she was depressed, but Dr. Segal stated that Plaintiff did not exhibit any psychotic symptoms. (*Id.*). Plaintiff stated that she was not currently seeing a psychiatrist. (*Id.*). On neurological examination, Dr. Segal observed that Plaintiff had normal cognitive function, no speech deficits, no cranial nerve deficits, and no focal motor, sensory, or coordination deficits. (*Id.*). Dr. Segal diagnosed history of absence seizures with occasional generalization, absent epilepsy, tension/migraine headaches, and a history of bipolar disorder. (*Id.*). Dr. Segal recommended increasing Plaintiff's dose of Lamictal. (Tr. 425). He also recommended that Plaintiff see a psychiatrist for her bipolar disorder. (*Id.*).

On December 6, 2009, Plaintiff had a grand mal seizure. (Tr. 303). Three days later, she saw Dr. Tina Addams. (*Id.*). Plaintiff stated that her grand mal seizure may be related to her recent stress level. (*Id.*). Dr. Addams reported that Plaintiff was cooperative, had clear speech, logical and coherent thoughts, and no suicidal ideations or visual hallucinations. (*Id.*). Dr. Addams adjusted Plaintiff's medication. (*Id.*).

On December 8, 2009, Plaintiff saw Dr. Segal, a neurologist, for her seizure. (Tr. 413). Plaintiff also complained of migraines. (*Id.*). Dr. Segal reported that Plaintiff had

clear speech, a normal gait, was neurologically intact, and had no motor or sensory deficits. (*Id.*). Dr. Segal diagnosed Plaintiff with generalized epilepsy, migraine headaches, and bipolar disorder. (Tr. 414). The doctor increased Plaintiff's Topamax and Lamictal dosage and prescribed Zomig. (*Id.*).

Plaintiff had follow-up appointments with Dr. Segal on August 2, 2011, November 2, 2011, March 5, 2012, June 5, 2012, and January 7, 2013. (Tr. 451, 815, 819, 822). Plaintiff complained of headaches, denied any recent seizures, and noted that, while her recent back surgery improved her back pain, she still had pain. (Tr. 451, 817). Dr. Segal reported that Plaintiff was neurologically intact, had no motor, coordination, focal, or sensory deficits, and a slightly antalgic gait. (Tr. 452, 818, 824). He observed that Plaintiff used a cane following her recent surgery. Dr. Segal diagnosed seizure disorder, probably absence epilepsy, headache disorder, and abnormal liver transaminases possibly related to antiseizure medication. (Tr. 452, 816). In January 2013, Plaintiff reported that she may have had a seizure in October 2012 when she had bronchitis, but there were no witnesses. (Tr. 822). Dr. Segal prescribed a head CT and adjusted Plaintiff's Topamax dosage. (Tr. 452, 817). Plaintiff's head CT scan, dated August 12, 2011, showed no acute hemorrhage, significant mass effect or large infarct. (Tr. 453).

On March 19, 2013, Dr. Segal completed a residual functional capacity questionnaire. (Tr. 830-31). In it, he stated that Plaintiff had one to two seizures per year, but they occurred more in the past. (Tr. 830). Dr. Segal noted that Plaintiff would not require unscheduled breaks due to her seizures and would never be absent. (*Id.*).

## III.   DISCUSSION

### A.   Standard of Review

This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3).  "In reviewing a decision of the Commissioner, a court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.'" *Rehr v. Barnhart*, 431 F. Supp. 2d 312, 317 (E.D.N.Y. 2006) (quoting 42 U.S.C. § 405(g)).  Section 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record.   Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  It is "a very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).

The Court also reviews the Commissioner's determination for legal error.  As the Second Circuit has explained:

> Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.

*Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating Plaintiff's claim, and

whether the Commissioner's findings were supported by substantial evidence on the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (stating that a reviewing Court does not examine a benefits case *de novo*). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Judgment on the pleadings may be granted under Rule 12(c) where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).

## B.    Determining Disability under the Social Security Act

The Social Security Act ("the Act") provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see Rice v. Comm'r of Soc. Sec.*, 114 F. Supp. 3d 98, 106 (W.D.N.Y. 2015). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The claimant bears the burden to demonstrate that she is disabled within the meaning of the Act. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002). The

claimant will be declared disabled only if her impairment is of such severity that she is unable to do her previous work and cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful activity.   42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis.  If the ALJ makes a determination of disability at any step, the evaluation will not continue to the next step.  20 C.F.R. § 416.920(a)(4).  The five steps are as follows:

1.    The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.    If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.    If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.    If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.    If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.  The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

### C.   The ALJ's Decision

In applying the five-step sequential evaluation in this matter, ALJ Greener made the following determinations.

At step one, the ALJ found that Plaintiff last met the insured status requirements of the Act on September 30, 2012, and had not engaged in substantial gainful activity during the relevant time period from her alleged onset date, September 29, 2009, through her date last insured, September 30, 2012. (Tr. 12-13).

At step two, the ALJ determined that Plaintiff had one severe impairment: degenerative disc disease of the lumbar spine. (Tr. 13). The ALJ noted that Plaintiff's medical record showed that she had been medically managed for several other physical impairments,[2] but concluded that the record did not establish that those other impairments limited her ability to engage in basic work activities. (Tr. 13-14). Even though the ALJ did not deem the other physical impairments severe, the ALJ noted that she had considered them in determining Plaintiff's RFC. (Tr. 14). The ALJ acknowledged Plaintiff's claim that her depression and anxiety limited her ability to work, but concluded that those mental impairments "did not cause more than minimal limitation in [her] ability to perform basic mental work activities and were therefore non-severe through the date last insured." (Tr. 14). The ALJ reasoned that those mental

---

[2]      Those conditions were "epilepsy, migraine headaches, knee pain, leg pain, non-displaced fracture of the right ankle, shoulder pain, myofascitis, obesity, hypertension, hyperlipidemia, tobacco use disorder, urinary tract infections, otitis media, polyscystic ovarian syndrome, and status post 2006 cholecystectomy." (Tr. 13).

impairments "caused no more than 'mild' limitation in any of the three functional areas [for evaluating mental disorders] and 'no' episodes of decompensation." (Tr. 14-15).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment, specifically, Listing 1.04. (Tr. 15-16).

Based on these conclusions and an analysis of the evidence, the ALJ determined that Plaintiff had the following RFC:

> Through the date last insured, the claimant had the residual function capacity to perform sedentary work as defined in 20 CFR 404.1567(a), because the claimant was able to lift and/or carry ten pounds occasionally and less than ten pounds frequently, stand and/or walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour workday. The claimant was able to occasionally stoop.

(Tr. 16).[3]  The ALJ reasoned that, while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence, and limiting effects of these symptoms [we]re not fully credible." (Tr. 17).  As part of the fourth step of the sequential analysis, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 21).

The ALJ then proceeded to the fifth step.  The ALJ determined that Plaintiff was considered a "younger individual" because, at time of the hearing, Plaintiff was thirty years old. (*Id.*).  The ALJ determined that Plaintiff had at least a high school education.

---

[3]     "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

(*Id.*).  The ALJ also determined that the issue of the transferability of Plaintiff's job skills was not material because the application of the Medical-Vocational Job Rules (the "Grids") supported a finding of not disabled, regardless of whether Plaintiff had transferable job skills.  (*Id.*).  Finally, considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that other jobs existed in the national economy that Plaintiff could perform.  (Tr. 21-22).

### D.  Plaintiff's Challenges to the ALJ's Decision

Plaintiff raises two primary arguments against the ALJ's determination.  First, she contends that substantial evidence does not support the ALJ's decision because the ALJ failed to properly evaluate the medical evidence in the record, assigning too little weight to treating sources and too much weight to opinions of sources who saw Plaintiff only once or not at all.  (Dkt. 7 at 19-25, 27-29).  Second, she contends that the ALJ erroneously concluded that she did not have a severe mental impairment.  *Id.* at 23-24, 26-27.

The Commissioner defends the ALJ's determination, arguing, in the main, that the ALJ properly evaluated the medical evidence in the record and determined that Plaintiff did not have a severe mental impairment.  (Dkt. 9-1 at 23-28).

### 1.  Treating Physician Rule

Plaintiff argues that the ALJ failed to properly evaluate the opinions of treating sources, Dr. Alam and Dr. Zeidman.  (Dkt. 7 at 20-21, 23-25).

Treating physicians "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of

- 33 -

individual examinations, such as consultative examinations. . . ." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The "treating physician rule" requires the ALJ to give "controlling weight" to the opinion of a claimant's treating physician regarding "the nature and severity of [the claimant's] impairment(s) . . . [if it] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The Second Circuit Court of Appeals has explained that an ALJ need not always give controlling weight to a treating source's medical opinion:

> An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various "factors" to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). An ALJ does not have to mechanically recite these factors, so long as the Court can "conclude that the ALJ applied the substance of the treating physician rule . . . and provide[d] 'good reasons' for the weight she gives to the treating source's opinion." *Id.* Moreover, "the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Id.*

In this case, the ALJ assigned "no weight" to the December 26, 2012 questionnaire that Dr. Zeidman completed and "very little weight" to the medical source statement completed by Dr. Alam. (Tr. 19, 20).

### a. Dr. Alam's Medical Source Statement

Plaintiff contends that the ALJ failed to perform the analysis required by 20 C.F.R. § 404.1527 when deciding to give "very little weight" to the medical source statement of Dr. Alam, Plaintiff's treating psychiatrist. (Dkt. 7 at 20). Plaintiff offers three reasons why the ALJ should have given Dr. Alam's opinion more weight: (1) Plaintiff treated with Family Services of Chemung County, where Dr. Alam worked, since March 2010; (2) Dr. Alam specialized in psychiatry; and (3) he examined Plaintiff multiple times. (*Id.* at 20-21). According to Plaintiff, the ALJ should have assigned "great if not controlling weight to the opinion of Dr. Alam." (*Id.* at 21). The Commissioner argues that the ALJ properly gave little weight to Dr. Alam's opinion because: (1) Dr. Alam's opinion was inconsistent with substantial evidence in the record; (2) he saw Plaintiff only four times in the relevant period; and (3) he communicated his opinion via a form, which is not particularly useful evidence. (Dkt. 9-1 at 26-27).

Here, the ALJ properly applied the treating physician rule by explicitly assigning "very little weight" to Dr. Alam's medical source statement and providing three good reasons for that assignment of weight. *See Halloran*, 362 F.3d at 32. First, as the ALJ found, Dr. Alam's medical source statement was inconsistent with the overall medical evidence, including the opinions of Dr. Long, Dr. Blackwell, and Dr. Kresser. (Tr. 20). An ALJ may properly reject a treating physician's opinion where it is unsupported by

medical evidence in the record. *See Bulavinetz v. Astrue*, 663 F. Supp. 2d 208, 211 (W.D.N.Y. 2009). In the statement, Dr. Alam concluded that Plaintiff's impairments would create difficulties for her, including completing a normal workday without interruptions from psychologically-based symptoms and working with co-workers. (Tr. 705-07). This is inconsistent with other evidence, which showed that Plaintiff appropriately interacted with medical staff during examinations, traveled out of state on multiple occasions, and reported good socialization and family relationships. (Tr. 304-62, 507-86, 657, 710-77, 800-08).

Second, as the ALJ found, the "treatment notes show minimal direct visits with Dr. Alam." (Tr. 20). "Generally, the longer a treating source has treated [a claimant] and the more times [the claimant has] been seen by a treating source, the more weight [the agency' will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(i). Here, the record reflects that Plaintiff had only four appointments with Dr. Alam before he prepared his medical source statement, dated November 7, 2012. (Tr. 705, 757-58, 765-66, 769-70, 772, 802).

Third, as the ALJ found, Dr. Alam's medical source statement was "a standard 'check a box' or 'fill in a blank' form containing minimal commentary." (Tr. 20, 705-09). Such form reports, consisting of checklists and fill-in-the-blank statements, are of limited evidentiary value. *Gray v. Astrue*, No. 09–CV–00584, 2011 WL 2516496, at *5 (W.D.N.Y. June 23, 2011) (citing *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993)).

Because the ALJ gave "good reasons" for affording limited weight to Dr. Alam's medical source statement, the Court finds that the ALJ properly applied the treating physician rule and upholds the ALJ's determination with respect to Dr. Alam's medical source statement. *See Halloran*, 362 F.3d at 32.

### b. Dr. Zeidman's December 26, 2012 Questionnaire

The ALJ gave "no weight" to Dr. Zeidman's December 26, 2012, Questionnaire because he completed it "jointly with the claimant" and therefore was "at least partially based on the reports of the claimant." (Tr. 19). The ALJ further explained that "the same report noted that [Plaintiff] declined further imaging and injections and opted instead to pursue other conservative measures of pain management." (*Id.*). By contrast, the ALJ gave "significant weight" to Dr. Zeidman's March 2012 statements that Plaintiff could not return to her past work (which involved restraining adolescents) and that she should retrain for work at a lower exertional level. (*Id.*). The basis for giving significant weight to those statements was Dr. Zeidman's "expertise, his treating relationship with [Plaintiff], and the consistency of this assessment with the overall medical evidence." (*Id.*).

Plaintiff contends that the ALJ's assignment of "no weight" to the Questionnaire was erroneous because "any medical report resulting from an examination would consider the statements of the patient." (Dkt. 7 at 24). Plaintiff also contends that the ALJ should have given some weight to the objective findings set forth in the Questionnaire; those findings were that Plaintiff had gait deviation, limited truncal mobility, positive neurological findings, and failed surgery and pain management. (*Id.*).

Plaintiff's challenge to the ALJ's weighing of the Questionnaire is unpersuasive. The ALJ determined that the Questionnaire was entitled to no weight because its conclusions were inconsistent with other evidence in the record, including other evidence from Dr. Zeidman. *See Halloran*, 362 F.3d at 32 (opinion not afforded controlling weight when it is inconsistent with other substantial evidence in the record). Specifically, the Questionnaire reflected that Plaintiff had significant limitations (such as an inability to stand or sit for more than two hours); however, as the ALJ noted, Dr. Zeidman had previously recommended that Plaintiff pursue retraining for work at a lower exertional level. And in the December 26th report in which the answers to the Questionnaire were documented, Dr. Zeidman noted that Plaintiff opted for conservative treatment of her back, thus casting doubt on the intensity of her limitations. Moreover, as the ALJ noted, the Questionnaire was completed jointly by Dr. Zeidman and Plaintiff, whose subjective complaints were deemed not fully credible by the ALJ (Tr. 18). *See Lewis v. Colvin*, 548 F. App'x 675, 678 (2d Cir. 2013) (finding substantial evidence for ALJ's decision not to give controlling weight to doctor's opinion when it was inconsistent with his own prior opinions and the findings of the other medical examiners, and was based on the plaintiff's subjective complaints). Under these circumstances, substantial evidence supports the ALJ's determination not to afford greater weight to the Questionnaire.

### 2.    Weight Assigned to Non-Treating Sources

Plaintiff challenges the ALJ's decision to afford great weight to the opinions of three non-treating sources, Dr. Long, Dr. Blackwell, and Dr. Kresser. (Dkt. 7 at 21-23).

The Commissioner responds that the assignment of weight was appropriate because the medical evidence supported the opinions of the non-treating sources. (Dkt. 9-1 at 24-25).

> Under 20 C.F.R. § 416.927(e)(2)(i):
>
> State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence. . . .

"[W]hen there are conflicting opinions between the treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight.'" *Harris v. Astrue*, No. 07–CV–4554 (NGG), 2009 WL 2386039, at *14 (E.D.N.Y. July 31, 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)). However, an examining physician's opinion may constitute substantial evidence to support an ALJ's decision, provided the opinion is supported by evidence in the record. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995); *see also Smith v. Colvin*, 17 F. Supp. 3d 260, 268 (W.D.N.Y. 2014) ("[T]he opinions of consulting sources 'may constitute substantial evidence if they are consistent with the record as a whole.'" (quoting *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005))). "This is particularly so where the consultant directly examines the applicant." *Smith*, 17 F. Supp. 2d at 268.

Even though they were consulting sources, the ALJ was entitled to rely on the opinions of Dr. Long, Dr. Kresser, and Dr. Blackwell because they were consistent with the record as a whole. In the main, each doctor concluded that Plaintiff had only mild restrictions in the functional areas for evaluating mental impairments. (Tr. 84, 88 657,

682).   Their assessments are consistent not only with each other, but also with the opinions of other medical providers.   For example, Dr. Segal, a treating source, concluded that, with respect to her mental impairments, Plaintiff was stable on medications and had no periods of decompensation.  (Tr. 672-73).  Moreover, Plaintiff regularly reported to Dr. Deines that her mental health impairments were medically managed on medication.  Given the medical record in this case, the ALJ did not err by affording great weight to the opinions of Dr. Long, Dr. Kresser, and Dr. Blackwell.

### 3.    Determination of No Severe Mental Impairment

Plaintiff also argues that the ALJ erred by finding that Plaintiff did not have a severe mental impairment, despite her diagnosis of bipolar disorder and long-term treatment by a psychiatrist.   (Dkt. 7 at 23-24, 26-27).   According to Social Security Regulations, "[a]n impairment or combination of impairments is not severe if it does not significantly limit a [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).

Here, the ALJ concluded that Plaintiff's "medically determinable mental impairments, considered singly and in combination, did not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities." (Tr. 14).  The ALJ rated Plaintiff's functional limitations in four functional areas, concluding that Plaintiff had mild limitations with respect to activities of daily living, social functioning, and concentration, persistence or pace, and that Plaintiff had no episodes of decompensation.  (Tr. 14-15).  Substantial evidence supported the ALJ's conclusion.  The record reflects that Plaintiff traveled out of state and went to Disney World each year, and

coached her daughter's softball team.  (Tr. 20, 494, 521, 548, 568, 571, 724, 742, 744).

Her treatment notes reflected that she had normal cognitive function, had clear speech,

local and coherent thoughts, good attention, concentration, and memory skills, and no

suicidal thoughts.  (Tr. 303, 424, 426, 657).  And, as discussed, Plaintiff consistently

reported to Dr. Deines that her medication for her mental health issues was working

adequately for her, and she responded well to her medication.  (*See, e.g.,* Tr. 536, 546,

558, 568).  For these reasons, the ALJ's conclusion regarding Plaintiff's mental health

impairments is supported by substantial evidence.  *See Perez*, 77 F.3d at 46.

## IV.   CONCLUSION

For the foregoing reasons, substantial evidence supports the Commissioner's

determination that Plaintiff was not disabled within the meaning of the Social Security

Act.  Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. 9) is

GRANTED, and Plaintiff's motion for judgment on the pleadings (Dkt. 7) is DENIED.

Plaintiff's complaint is dismissed.  The Clerk of the Court is directed to close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:        September 28, 2016
              Rochester, New York